UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LATERAL RECOVERY LLC, BENCHMARK
BUILDERS, INC., FTE NETWORKS, INC.,
JUS-COM LLC and FOCUS WIRELESS, LLC,

                                    Plaintiffs,

            v.

UNIQUE FUNDING SOLUTIONS LLC,
YAAKOV WINOGRAD a/k/a JAKE
WINOGRAD, and JOHN and JANE DOE
INVESTORS,

                                    Defendants.

---

Civ. A. No.:  1:22-cv-9876

## COMPLAINT

Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"),

FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC

("Focus") (collectively "FTE") as and for their Complaint against Unique Funding Solutions

("Unique Funding" or the "MCA Company"), Yaakov Winograd a/ka/ Jake Winograd

("Winograd") (Unique Funding and Winograd collectively referred to as the "Principal"), and John

and Jane Doe Investors (the "Investors" together with the MCA Company and the Principal,

collectively, the "Defendants" or the "Enterprise"), state as follows:

## NATURE OF THE ACTION

1.          This is a RICO action against a merchant cash advance ("MCA") company that is

controlled and manipulated by its member and manager Winograd to carry out a long-running

scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from FTE.  Unique

Funding entered the so-called "Merchant Agreements" with FTE pursuant to which it purportedly

paid lump sums to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments.  While couched as the purchase and sale of future receipts, the agreements' terms, conditions, and actions of the Principal demonstrate that despite the form of the agreements (the "MCA Agreements"), no sale of receipts ever took place.

2.      Rather, the MCA Agreements were loans for which Defendants negotiated and demanded repayment within a fixed time period—sixty days for the First Loan Transaction, sixty-five days for the Second Loan Transaction, and thirty-five days for the Third Loan Transaction (as described below).  The payment term and interest charged are the metrics that the Defendants use to dictate the terms of the transactions.  And under New York law, intent is the touchstone of whether a transaction is a loan, regardless of what the face of the contract purports it to be.  Acknowledging the transactions as the true loan that they are, the loans charged an interest rate that exceeded **220%**, **219%**, and ***395%***, multiple worlds and universes greater than the maximum 25% permitted under New York Penal Law.

3.      The Defendants are not alone.  Numerous other MCA companies use the same sham MCA agreements as a cover for their loansharking activities.

4.      For instance, the sham nature of Yellowstone Capital LLC's ("Yellowstone") form agreement recently drew scrutiny by New York's highest court.  In answering certified questions from this Circuit concerning the procedural remedies available to redress Yellowstone's (also known as CMS) *unlawful* collection activities, a dissenting member of the Court questioned the underlying premise of the questions presented, i.,e., that the underlying judgment was presumed to be a lawful one:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily

2

withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

5.      New York's highest court is not alone.  The Attorneys General of both New York and New Jersey each filed separate actions against others using the same sham form of MCA agreement, alleging that the transactions are disguised loans subject to this state's usury laws.  ***See Exs. 1-2.***

6.      The New Jersey Attorney General's Office ("NJ AG") and the Federal Trade Commission (the "FTC") each filed separate actions against Yellowstone and others, alleging that for years they have engaged in deceptive conduct to conceal the true nature of their transactions with merchants, including the very conduct underlying this action.  *See* **Exs. 2-3**, which factual allegations are incorporated herein by reference.

**<u>Winograd's Affiliation with Yellowstone</u>**

7.      Notably, Winograd worked at Yellowstone during the time period that the NJ AG and the FTC investigated Yellowstone and others, for the unlawful loansharking and other fraudulent and deceptive practices. It was during this time period, that Winograd learned the tricks of the trade for operating an unlawful loansharking enterprise. Winograd's role and employment at Yellowstone during the NJ AG and FTC investigation are evidenced by his email communications through his email address <u>jwinograd@yellowstonecapllc.com</u> during the relevant time frame. *See* **Ex. 4**.

8.     In or around early 2016, Yellowstone and other affiliated MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

9.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

10.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

11.     Yellowstone targets small businesses in need of "a loan":



12.     Yellowstone employees (such as Winograd) also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

13.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

14.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

15.     Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

4

16.     The actors in the videos were all employees of Yellowstone.

17.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

18.     One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[1]

19.     This video is titled "Bad Credit Business Loans ™ | 855-445-9649." *Id.*

20.     The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account. *Id.* This video clearly targeted these loans for personal consumer use.

21.     Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me**.  So I went online and found Yellowstone Capital.  I applied for a <u>loan on Monday based on my monthly sales and on Wednesday they gave me my money.</u>**  It's crazy because my heartrate is higher than my credit score.  So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse.  *Id.* (emphasis added).

22.     Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

23.     As the video played, subtitles described Yellowstone's MCA program:

> Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

> We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

---

[1] EZBusinessLoans, *Bad Credit Business Loans™ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**<u>Our business loans</u>** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **<u>bad credit business loan</u>** application today! *Id.* (emphasis added).

24.     These videos all link to a loan application on Yellowstone's website. *Id.*

25.     On or about April 1, 2013, a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business" was posted.[2]

26.     The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **<u>a simple loan</u>** is at your disposal despite FICO score.   We are in this together. Call 877-972-2748 now or visit us at <u>www.yellowstonecap.com</u> *Id.* (emphasis added).

27.     Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

28.     The New Jersey Attorney General undertook an investigation of Yellowstone given its unlawful practices and conduct.

29.     As part of this investigation, the New Jersey Attorney General reviewed Yellowstone's own documents.

---

[2] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

6

30.     As part of this investigation, the New Jersey Attorney General also interviewed merchants regarding their experiences with Yellowstone's actual business practices.

31.     Based on this investigation, including a review of Yellowstone's own business records, the New Jersey Attorney General concluded that the reconciliation provision is a sham and that the transactions are loans.

32.     Specifically, the New Jersey Attorney General's investigation found that consumers were unable to modify daily payments through reconciliation.

33.     The New Jersey Attorney General's complaint against Yellowstone notes both that some merchants were unable to reach Yellowstone and that Yellowstone refused to adjust the amount for other merchants.

34.     The New Jersey Attorney General's complaint noted three specific instances in which reconciliation attempts were ignored or even scorned:

a.     Before defaulting and being forced into an unfavorable settlement agreement with Defendant Yellowstone, a Pennsylvania Consumer had emailed Yellowstone twice "asking for relief and to slow down my payback." Yellowstone replied that the Consumer "was a new customer and that [the Consumer] was not far enough in to [her] loan, when in fact [she] was more than 60% through [her] second loan with Yellowstone."

b.     One Consumer sent an email to Defendant MCA Recovery providing in pertinent part: "this week will be a severe cash flow crunch for me – leading up to Memorial Day weekend sales have been slower than usual. Can you please postpone pulls for a week until after the holiday?" MCA Recovery responded by asking if the Consumer had another account that it could debit from.  In response to subsequent emails from the Consumer explaining that "I'm 62 with a young disabled son, I'm about to lose our home, and file for bankruptcy" and again requesting a revised repayment plan, MCA Recovery forwarded that email to Defendant Yellowstone with the message: "CONTROL YOUR GIRL. Craziest fucking merchant ever."

c.     When a New York Consumer contacted Defendant Yellowstone to advise that his account was overdrawn and to request a "temporary daily payment decrease from $750 to $100 for 3 weeks," Yellowstone "stated they needed several documents of which all were sent. Then they needed one more document[,] [but] when it was sent[,] they stated since I

had taken out a loan after theirs[,] they could not work with me even though I informed them that my account was overdrawn and if I didn't get the issue resolved I would not have the ability to keep my bank account opened. They were not concerned and still refused to negotiate." In responding to the Consumer, Yellowstone noted that he "accepted funds based on set terms that he ultimately could not meet" and that the Consumer "had taken the full funding amount based on a contractually predetermined agreement in terms of payback schedule."

35.     The New Jersey Attorney General's investigation also found that merchants were frequently induced to "refinance" rather than engage in reconciliation, but did not disclose that this strategy would result in double the interest on the same principal amount.

36.     The interest rates on Yellowstone's loans are routinely well in excess of usury laws. For instance, in the complaint by the New Jersey Attorney General against Yellowstone, the New Jersey Attorney General listed three examples of transactions by Yellowstone or subsidiaries that it had reviewed that were well in excess of New Jersey's 50% usury rate for corporations:

a.     Yellowstone subsidiary Green Capital loaned a Colorado Consumer $125,000 (the "Purchase Price") and required the Consumer to pay back $186,875 (the "Purchased Amount") in daily payments of $1,995 (the "Daily Payment") over the course of approximately 93 business days, or approximately 119 calendar days. Thus, the annual interest rate charged by Green Capital exceeds the rates permitted by New Jersey usury laws.

b.     A Florida Consumer's Merchant Agreement with Yellowstone provided for a Purchase Price of $3,000, a Purchased Amount of $4,377, a Daily Payment of $65 per business day, and repayment term of 85 days. Thus, the annual interest rate charged by Yellowstone exceeds the rates permitted by New Jersey usury laws.

c.     A Maryland Consumer's Merchant Agreement with Yellowstone subsidiary World Global provided for a Purchase Price of $285,000, a Purchased Amount of $427,215, a Daily Payment of $4,299 per business day, and repayment term of 127 days. Thus, the annual interest rate charged by World Global exceeds the rates permitted by New Jersey usury laws.

37.     Instead of reconciliation, troubled merchants are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest.

38.     The New Jersey Attorney General's investigation determined that Yellowstone pushed for refinance as a means of avoiding reconciliation.  This is exactly the tactic that Unique Funding employed as described in further detail below.

39.     On information and believe, Yellowstone and other MCA companies (such as Unique Funding) systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

40.     Yellowstone and the other affiliated MCA companies also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

41.     Yellowstone and its affiliated MCA companies show in their underwriting practices that their agreements are loans.  Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  When underwriting new transactions, Yellowstone does not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

42.     When Yellowstone and its affiliated MCA companies go to collect upon their agreements, they treat them just like loans.  For example, they require that the merchant make fixed daily payments under their agreements and grant security interests in substantially all of the merchant's assets to ensure that the daily payments are made.

43.     They also require that the merchants execute confessions of judgment that could be filed if the merchant fails to make as few as two daily payments under their agreements.  In other

words, Yellowstone and its affiliated MCA companies structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

44.     Yellowstone and its affiliated MCA companies also engage in other unscrupulous behavior toward their merchants.  Among other things, they often fail to advance merchants the full amounts provided for in their agreements, charge exorbitant fees for services that are never provided and costs that are never incurred, and often simply over collect the daily payments due under their agreements so that merchants end up paying tens of thousands of dollars more than they are required to pay under the applicable agreements.

45.     In the Federal Trade Commission's complaint against Yellowstone, for instance, the FTC noted evidence of misrepresentations regarding the financing amount, noting that merchants only learn the funding they are actually receiving *after* the documents have been signed. The FTC reports one consumer to have said, upon learning that she would receive roughly $4,000 less than her contract stated, "I think something is wrong," and "you guys are like highway robbery."

46.     They also fail to properly record merchant's payments such that merchants' frequently "overpay", and thereafter they fail to give the merchant credit for the payments or simply refuse to repay the merchant when the merchant demands that the overpayments be repaid.

**Winograd Forms Unique Funding to continue the deceptive and fraudulent conduct**

47.     The NJ AG and FTC investigations initiated against Yellowstone and its affiliated MCA companies did not deter Winograd from continuing his efforts to pursue unlawful and deceptive conduct through the issuance of usurious loans.

48.     Winograd, in an effort escape the heat of the NJ AG and FTC investigations, formed Unique Funding to continue the deceptive and fraudulent practices of the trade which he engaged in at Yellowstone.

49.     In or around March 2016, given the NJ AG and FTC investigations, Winograd left Yellowstone to continue the deceptive and fraudulent conduct through his own unlawful loansharking company—Unique Funding.

50.     Unique Funding was formed in March 2016. *See* **Ex. 5**.

51.     Unique Funding was strategically organized under the laws of New York so that it could utilize New York's confession of judgment statute and post-judgment collection devises.

52.      Winograd is an authorized representative of Unique Funding as further evidenced by Affidavits of Non-Payment filed in other actions initiated by Unique Funding to collect upon usurious sham MCA agreements. *See* **Ex. 6**.

53.     Winograd through Unique Funding began to prey upon and target businesses in need of loans. Plaintiff was one of the Defendants' targets.

54.     Notably, at the time of the transactions with Unique Funding, FTE, a then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement.  The Defendants took advantage by effectively robbing FTE's shareholders and its creditors.

55.     It is against this backdrop that Plaintiffs file this Complaint.

## THE PARTIES

56.     FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

11

57.     At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

58.     At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

59.     At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

60.     At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

61.     Defendants have been operating Unique Funding since at least March 2016. *See* Ex. 5.

62.     Unique Funding Solutions LLC is a limited liability company duly organized under the laws of New York with its principal place of business in New York at 71 South Central Avenue, 2nd Floor, Valley Stream, New York 11580.

63.     Yaakov Winograd is an individual who resides in New York.

64.     Upon information and belief, each of the John and Jane Doe Investors is a citizen of New York.

## JURISDICTION

65.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

66.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

67.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry

68.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[4]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for.  It's pretty much unregulated."[5]

69.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[6]

70.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to

---

[3] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[4] *Id.*
[5] *Id.*
[6] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

71.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The MCA Agreements are Substantively and Procedurally Unconscionable.**

72.     The MCA Agreements entered into by the Plaintiffs, are unconscionable contracts of adhesion that were not negotiated at arms-length.

73.     Instead, they contain one-sided terms that prey upon the desperation of the small businesses and their individual owners and help conceal the fact that the transactions, including these involving FTE, are really loans.

74.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) a right

of access to the merchant's premises and operations in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney with full authority "to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller…"

75.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.  Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant Underwriting Fee or Origination Fee.

76.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

77.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of

Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just two fixed daily payments.

**D.      The Intent of the Defendants is to Issue Fixed-Term Loans Using a Sham Reconciliation Provisions to Disguise the Loans.**

78.      In order to evade state usury laws, the Defendants include a sham reconciliation provision to give the appearance that the loans do not have a definite term.

79.      Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

80.      For example, if a MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

81.      In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

82.      For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

83.      In fact, the daily payment is calculated by dividing the payback amount by the intended duration of the loan.

84.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**G.     The Enterprise Intentionally Disguised the True Nature of the Transactions.**

85.     Despite their documented forms, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise assumed no risk of loss if an account debtor failed to pay an allegedly purchased receivable because the daily payments would be deducted from the next merchant that paid a merchant.

(i)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(j)     The Enterprise required that the merchant obtain business interruption insurance and name the Enterprise as both an additional insured and a loss payee under the policy.

(k)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

(l)     Bankruptcy was an event of default under the agreements.

(m)     The Enterprise required that the merchant's owners guarantee the representations, covenants, and warranties under the agreements and the owners guaranteed obligations were triggered upon the filing of bankruptcy.

86.     But most important is intent:  New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Defendants, which determine the payback based on the number of days in which the Defendants want to be paid back.  The number of days for payback has no relation to the timing of the percentage of receivables that the Defendants and the MCA Company was purporting to purchase.

87.     Instead of providing reconciliation, troubled merchants, like FTE here, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many thousands percent range.

88.     Upon information and belief, the Defendants systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

89.     The Defendants also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

90.     The Defendants also show in their underwriting practices that their agreements are loans.  Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  When underwriting new transactions, the Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all—yet they still charge hundreds of thousands for their so-called underwriting.

91.     When the Defendants go to collect upon their agreements, they treat them just like loans.  For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the MCA Company in substantially all of the merchant's assets to ensure that the daily payments are made.

92.     They also require that the merchants execute confessions of judgment that the MCA Company could file if the merchant fails to make as few as two daily payments under their agreements.  In other words, the Defendants structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

93.     The Defendants also engage in other unscrupulous behavior toward their merchants.  Among other things, the Defendants often fail to advance merchants the full amounts

provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

## THE UNDERLYING FTE TRANSACTIONS

**A.    FTE Networks.**

94.    At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings.   The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.   The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation.  Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

95.    Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

96.    Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

97.    Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.    Lateral**

98.    On or about October 28, 2016, Lateral, as administrative agent for the lenders,

entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

99.   FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

100.   Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

101.   In or around July 2019, FTE defaulted under the terms of the Credit Agreement, due to increasing financial stress incurred through Defendants' MCA agreements' onerous and usurious terms.   Thus, like FTE, Lateral's cash flow was materially impacted by Defendants' usurious business practices.

102.   Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, but not limited to, the claims asserted in this action.

## C.   FTE Networks and the MCA Industry

103.   In 2018, prior to defaulting under the Credit Agreement, FTE needed additional financing.   To procure that financing, FTE turned to the merchant cash advance industry, including the Defendants, falling victim to the tactics described above.

**D.**    **The Loan Transactions.**

104.    FTE entered into three loan transactions with the Defendants ("Loan Transactions").

**First Loan Transaction**

105.    The first loan transaction was entered on June 12, 2017 ("**First Loan Transaction**").

106.    Specifically, FTE executed that certain agreement entitled Agreement for the Purchase and Sale of Future Receipts (the "**First Loan Agreement**"), that certain agreement document entitled Personal Guaranty of Performance (the "**First Guaranty**"), that certain addendum entitled Appendix A – List of Fees and Charges (the "**First Fee Structure Addendum**"), and that certain Affidavit of Confession of Judgment ("**First Affidavit of Confession of Judgment**"), (collectively the First Loan Agreement, First Guaranty, First Fee Structure Addendum, First Confession of Judgment, the "**First Loan Documents**"). *See* **Ex. 7**.

107.    On the face of the First Loan Agreement, Unique Funding was to advance $75,000, which was disguised as the "Purchase Price."

108.    The amount to be repaid was $109,500, which was disguised as the "Purchased Amount."

109.    The loan was to be repaid through fixed daily ACH withdrawals in the amount of $1,825.00 (a "Daily Amount"), which was disguised as a purported good-faith estimate of 15% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by Unique Funding.

110.    The negotiated term of the loan was approximately 60 business days.  On its face, the loan had an interest rate in excess of 220%.

111.    In addition, FTE was required to pay $7,5000 or up to 10% as a purported "Origination Fee" as further consideration for making the loan, along with other fees itemized in the First Fee Structure Addendum.

**Second Loan Transaction**

112.    On August 18, 2017, FTE entered into the second loan transaction with the Defendants through Unique Funding ("**Second Loan Transaction**").

113.    Specifically, FTE executed that certain agreement entitled Agreement for the Purchase and Sale of Future Receipts (the "**Second Loan Agreement**"), that certain agreement document entitled Personal Guaranty of Performance (the "**Second Guaranty**"), that certain addendum entitled Appendix A – List of Fees and Charges (the "**Second Fee Structure Addendum**"), and that certain Affidavit of Confession of Judgment ("**Second Affidavit of Confession of Judgment**"), (collectively the Second Loan Agreement, Second Guaranty, Second Fee Structure Addendum, Second Confession of Judgment, the "**Second Loan Documents**"). *See* **Ex. 8**.

114.     On the face of the Second Loan Agreement, Unique Funding was to advance $80,000, which was disguised as the "Purchase Price."

115.    The amount to be repaid was $119,920, which was disguised as the "Purchased Amount."

116.    The loan was to be repaid through fixed daily ACH withdrawals in the amount of $1,816.97 (a "Daily Amount"), which was disguised as a purported good-faith estimate of 15% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by Unique Funding.

117.    The negotiated term of the loan was approximately 65 business days.  On its face, the loan had an interest rate in excess of 219%.

118.    In addition, FTE was required to pay $8,000 as a purported "Origination Fee" as further consideration for making the loan, along with other fees itemized in the Second Fee Structure Addendum.

**Third Loan Transaction**

119.    On November 15, 2018, FTE entered into a loan transaction with the Defendants through Unique Funding ("**Third Loan Transaction**").

120.    Specifically, FTE executed that certain agreement entitled Agreement for the Purchase and Sale of Future Receipts (the "**Third Loan Agreement**"), that certain agreement document entitled Personal Guaranty of Performance (the "**Third Guaranty**"), that certain addendum entitled Appendix A – List of Fees and Charges (the "**Third Fee Structure Addendum**") and that certain Affidavit of Confession of Judgment ("**Third Confession of Judgment**"), (collectively with the Third Loan Agreement, Third Guaranty, Third Fee Structure Addendum, Third Confession of Judgment, the "**Third Loan Documents**"). *See* **Ex. 9**.

121.    On the face of the Loan Agreement, Unique Funding was to advance $750,000, which was disguised as the "Purchase Price."

122.    The amount to be repaid was $1,124,250, which was disguised as the "Purchased Amount."

123.    The loan was to be repaid through fixed daily ACH withdrawals in the amount of $32,121.42 (a "Daily Amount"), which was disguised as a purported good-faith estimate of 16% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by Unique Funding.

124.     The negotiated term of the loan was approximately 35 business days.  On its face, the loan had an interest rate in excess of 395%.

125.     In addition, FTE was required to pay $75,000.00 as a purported "Origination Fee" as further consideration for making the loan, along with other fees itemized in the Third Fee Structure Addendum.

126.     The amount of money unlawfully obtained here by Defendants is staggering.  In the span of just thirty-five days, FTE received significantly less than $750,000 in actual cash from the Defendants and paid back in excess of $1,124,250.00

**Balance Transfer and Payoff Acknowledgement Transaction**

127.     On November 16, 2018, Unique Funding entered into a Balance Transfer and Payoff Acknowledgment with FTE ("Balance Transfer and Payoff"). *See* **Ex. 10**.

128.     The Balance Transfer and Payoff specifically states:

> I, Merchant(s), on behalf of Business hereby acknowledge that a part of the Purchase Price will be used to payoff the amount purchased and owing under the Existing Merchant Agreement with UFS (the "Payoff"). The Payoff amount will be set-off by UFS internally as a result of this Payoff, the actual dollar amount paid to Business pursuant to the New Merchant Agreement with UFS entered into as of the date hereof will be reduced by that Payoff amount. However, Merchant acknowledges that he/she understands that this will not reduce the Purchased Amount in any way whatsoever.

129.     The Balance Transfer and Payoff was in the amount of $562,125.15. *See* Ex. 11.

130.     As demonstrated by the Balance Transfer and Payoff, the Purchase Price of the Third Loan Transaction was deducted by the amount of $562,125.15.

131.     The Purchase Price of the Third Loan Transaction was further deducted by the sham fees charged by the Defendants, including but not limited to the Origination Fee.

132.    Thus, with respect to the Third Loan Transaction, Plaintiff only received $112,874.85, but was required to pay back $1,124,250.00, which make Plaintiff's damages in excess of $1,011,375.15.

133.    Plaintiff did not even receive the Purchase Price of $750,000 of the Third Loan Transaction. Instead, the Purchase Price of the Third Loan Transaction was deducted by the payoff balance ($562,125.15) of the prior usurious First Loan Transaction and Second Loan Transaction and was further deducted by the Origination fee and other fees. Plaintiff has suffered significant damages as Plaintiff was obligated to repay funds well above the amounts advanced by the Defendants.

**E.    The Enterprise Operates by using a Form MCA agreement.**

134.    The Loan Transactions and the Loan Documents evidence two primary form templates (the "First Unique Funding Form") and the (the "Second Unique Funding Form") used by the Enterprise.

135.    The First Loan Transaction and Second Loan Transaction evidence implementation of the First Unique Funding Form. The Third Loan Transaction evidences implementation of the Second Unique Funding Form. Both forms are virtually identical with minor differences.

136.    While there are differences within a specific agreement for the loans entered into by the Enterprise, such as the date, the funding entity, and the amounts funded, these details are not material as to whether an MCA agreement is actually a loan. As highlighted below, the First Unique Funding Form and Second Unique Funding Form evidence factors that are indicative of loans.

137.    In *Lateral Recovery, LLC v. Capital Merchant Services LLC,* 21-cv-9336 (LJL) (Sept. 30, 2022), a recent decision issued by the Southern District of New York, the Court

underwent a lengthy analysis in assessing similar form agreements and found that several provisions demonstrate that these "merchant cash agreements" were truly indicative of loans. *Id*. The Court noted, amongst other things, that "the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id*. (citing *Fleetwood Services, LLC v. Ram Capital Funding LLC*, 2022 WL 1997207, at \*9 (S.D.N.Y June 6, 2022)). Moreover, the Court explained: "Recently, Federal Courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling." *Id*.

## L.    The First Unique Funding Form.

138.    The First Unique Funding Form demonstrates that the terms of the template agreement used by the Enterprise are indicative of loan terms.

139.    For example, the Changes to the Daily Amount provision, the Events of Default provision, and the Remedies provision, demonstrate the document was in fact intended to memorialize a loan agreement irrespective of how it is labeled, and that Unique Funding is guaranteed absolute right of repayment in all circumstances.

140.    Section 2 of the First Unique Funding Form titled "Seller May Request Changes to the Daily Amount" represents an illusory reconciliation provision. Specifically, the provision states:

1.    Seller May Request Changes to the Daily Amount: The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

141.    Notably, this provision makes clear that the merchant would need to request a reconciliation in order for the Daily Amount to be adjusted in the future. In the scenario where a merchant is unable to generate or collect "receivables" to pay the Daily Amount, the reconciliation provision proves meaningless as any reconciliation would occur after-the-fact.

142.    In fact, the circumstances that would permit Unique Funding (as a lender) to call an Event of Default and to require that the merchant pay 100% of the uncollected Purchased Amount will have already taken place long before any reconciliation could take place or requested by a merchant.

143.    Thus, the reconciliation provision is illusory in practice.

144.    The Events of Default provision states:

15.  Events of Default. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer and/or Buyer's Affiliate Unique Funding Solutions LLC; or (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer are rejected by Seller's bank.

145.    This provision demonstrates that if a merchant fails to make the Daily Amount payment twice, the merchant is considered in default. Therefore, irrespective of the merchant's ability to pay the Daily Amount, it would still be liable to Unique Funding to repay the full Purchased Amount.

146.    The Remedies provision states:

16.  Remedies. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1.   The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

16.2.   Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

16.3.   Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.4. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

16.5. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

16.6. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

16.7. Buyer may exercise and enforce its rights as a secured party under the UCC.

16.8. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

147.    As demonstrated above, in the scenario where a merchant fails to make the Daily Amount just twice, it is considered in default and therefore the Remedies provision would further accelerate the full Purchased Amount due and owing, so that Unique Funding can be made whole. Specifically, the Remedies provision states that "the Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charged (including legal fees) due under this Agreement will become due and payable in full immediately."

148.    Similarly, if there are two or more ACH transactions attempted that are rejected by the merchant's bank in any given calendar month (irrespective if the Daily Amount can be paid), the merchant is held to be in default and Unique Funding is entitled to full payment under the acceleration clause of the Remedies provision.

149.    The Remedies provision evidences that Unique Funding (as a lender) is made whole and is entitled to repayment under all circumstances if any Daily Amount payment is missed or unable to be made by the merchant. There is no transfer of risk.

150.    Stated differently, irrespective of any event of default, Unique Funding (as a lender) would be entitled to absolute repayment.

151.    The effect of the aforementioned provisions is to further confirm that the First Unique Funding Form is a template agreement that evidences a loan.

29

152.    The provisions as a whole in the First Unique Funding Form eliminate any risk on the part of Unique Funding and gives it full and absolute repayment rights.

153.    The label placed on the First Unique Funding Form that it is an "Agreement for the Purchase and Sale of Future Receipts" is simply an illusory label.

154.    The provisions confirm that a merchant is obligated to pay a fixed amount on a daily basis. And if it fails to do so, just twice, it is considered in default and Unique Funding (as a lender) has access to all rights and remedies in the First Unique Funding Form agreement.

**M.    The Second Unique Funding Form.**

155.    The Second Unique Funding Form demonstrates that the terms of the template agreement used by the Enterprise are indicative of loan terms.

156.    Similar to the First Unique Funding Form, the Changes to the Daily Amount provision, the Events of Default provision, and the Remedies provision, demonstrate the document was in fact intended to memorialize a loan agreement irrespective of how it is labeled, and that Unique Funding is guaranteed absolute right of repayment in all circumstances.

157.    Section 2 of the Second Unique Funding Form titled "Seller May Request Changes to the Daily Amount" represents an illusory reconciliation provision. Specifically, the provision states:

> **2. Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

158.    Notably, this provision makes clear that the merchant would need to request a reconciliation in order for the Daily Amount to be adjusted in the future. In the scenario where a

merchant is unable to generate or collect "receivables" to pay the Daily Amount, the reconciliation provision proves meaningless as any reconciliation would occur after-the-fact.

159.    In fact, the circumstances that would permit Unique Funding (as a lender) to call an Event of Default and to require that the merchant pay 100% of the uncollected Purchased Amount will have already taken place.

160.    Thus, the reconciliation provision is illusory in practice.

161.    The Events of Default provision states:

> 15.  **Events of Default:** The occurrence of any of the following events shall constitute an "Event of Default":
>
> (a) any act or omission by or on behalf of Seller that has the result of interfering with, or circumventing, the payment to Purchaser of the Purchased Amount, including without limitation, adding or changing processors without Buyer's prior written consent, conducting business under an alternative name, making use of any depository accounts other than the Account without Buyer's prior written consent, encouraging customers to avoid making card payments or other act that results in a material decrease in the monthly number of deposits made and/or processing batches deposited to the Account that is disproportionate to any changes in the Future Receivables, or manipulating the use and form of business entities for the purpose of avoiding Seller's obligations hereunder;
>
> (b) Seller violates any representation, warranty, agreement, promise or covenant set forth in this Agreement;
>
> (c) Seller applies for, or enters into, any other form of financing without the prior written consent of Buyer;
>
> (d) Seller interferes with Buyer's access to electronic bank information for the Account;
>
> (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer; or
>
> (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer that are rejected by Seller's bank.
>
> (g) Seller completes a transaction that results in a change of control of Seller's business;
>
> (h) Seller becomes subject to any judgment, garnishment, or tax lien following the date of this Agreement;
>
> (i) Seller has an event of default under any other material agreement or contract; or
>
> (j) Seller fails to maintain an amount equal to twice the Daily Amount in the Account on any day during the term of this Agreement.

162.    This provision demonstrates that if a merchant fails to make the Daily Amount payment twice, the merchant is considered in default. Therefore, irrespective of the merchant's ability to pay the Daily Amount, it would still be liable to Unique Funding to repay the full Purchased Amount.

163.    The Remedies provision states:

31

- **16.4.** This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.
- **16.5.** Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.
- **16.6.** Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.
- **16.7.** Buyer may exercise and enforce its rights as a secured party under the UCC.
- **16.8.** All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

    **16.**   **Remedies:** If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:
- **16.1.** The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.
- **16.2.** Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.
- **16.3.** Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

164.     As demonstrated above, in the scenario where a merchant fails to make the Daily Amount just twice, it is considered in default and therefore the Remedies provision would further accelerate the full Purchased Amount due and owing, so that Unique Funding can be made whole. Specifically, the Remedies provision states that "the Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charged (including legal fees) due under this Agreement will become due and payable in full immediately."

165.     If there are two or more ACH transactions attempted that are rejected by the merchant's bank in any given calendar month (irrespective if the Daily Amount can be paid), the merchant is held to be in default and Unique Funding is entitled to full payment under the acceleration clause of the Remedies provision.

166.     The Remedies provision demonstrates that Unique Funding (as a lender) is made whole and is entitled to repayment under all circumstances if any Daily Amount payment is missed or unable to be made by the merchant. There is no transfer of risk.

167.    The effect of the aforementioned provisions is to further confirm that the Second Unique Funding Form is a template agreement that evidences a loan.

168.    The provisions as a whole in the Second Unique Funding Form eliminate any risk on the part of Unique Funding and gives it full and absolute repayment rights.

169.    The label placed on the Second Unique Funding Form that it is an "Agreement for the Purchase and Sale of Future Receipts" is simply an illusory label.

170.    The provisions confirm that a merchant is obligated to pay a fixed amount on a daily basis. And if it fails to do so, just twice, it is considered in default and Unique Funding (as a lender) has access to all rights and remedies in the Second Unique Funding Form agreement.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

171.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

172.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

173.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

174.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the 'roughing up tactics' used by usurious lenders to enforce payment."

33

175.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

176.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

177.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

178.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

179.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

180.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

181.    Defendants issue usurious loans under the guise of an MCA agreement to borrowers facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

182.    While these MCA agreements purport to be a purchase of identifiable receivables, their terms actually involve Defendants' purchase of "Merchant's future accounts, contract rights and other obligations arising from or to the payment of monies form Merchant's customers' and/or other third party payors…"

183.    While the MCA agreements purport to allow for reconciliation, their actual terms reveal this to be illusory as borrowers are limited to one (1) reconciliation request per calendar

month, and since the loan here had a payment term of less than one month, there is no actual promise to reconcile.

184.     Defendants structure the MCA agreements to ensure absolute repayment through the aforementioned sham reconciliation provision, which leaves the loan's term definite as a matter of mathematics, and forcing the borrower's principals to personally guaranty the Merchant's entire obligations in the even the Merchant

**B.     Culpable Person.**

185.     Winograd is classified as a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is either an individual, corporation or limited liability company capable of holding a legal interest in property.

186.     At all relevant times, Winograd was, and is, a person that exists separate and distinct from the Enterprise, described below.

187.     Winograd is a member, manager, and authorized representative of Unique Funding.

188.     During the relevant time period, Winograd controlled transactions within the Enterprise and was an authorized representative of Unique Funding.

189.     Through his operation of Unique Funding, the RICO Person solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.     The Enterprise.**

190.     Unique Funding, Winograd, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

191.    Unique Funding, Winograd, and the John and Jane Doe Investors are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

192.    Since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

193.    Over this period the Enterprise individual members would assume various trade names to do business under.  This was intentionally done as part of the Enterprise's hierarchy to ensure that corporate members of the Enterprise were as insulated as possible from liability under the usurious agreements by creating plausible deniability as each specific member's liability and obligations under each specific agreement.

194.    Indeed, through the use of various alter-ego identities for the individual members of the Enterprise, Defendants intend to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Enterprise is automatically withdrawing monies from borrowers' accounts.

195.    Upon information and belief, the Enterprise's use of alter-ego names for its members was orchestrated by Winograd, as the common thread between all these members and their alter-egos is that they were ultimately controlled and for the benefit of the Defendants.

196.     The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

197.     Since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

198.     The Enterprise's conduct further constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

### D.     The Roles of the RICO Person in Operating the Enterprise, and the roles of the individual companies within the Enterprise.

199.     The RICO Person, Winograd, has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

### i.     Yaakov Winograd.

200.     Winograd is responsible for the day-to-day operations of the Enterprise, primarily through the assumed name Unique Funding, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

201.    In his capacity as a member of the Enterprise, Winograd is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

202.    Winograd has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

203.    Winograd has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to others within the Enterprise.

**ii.    Unique Funding.**

204.    Unique Funding is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

205.    Through its assumed names, Unique Funding participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan;

(iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

206.    In this case, Unique Funding, through Winograd, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### v.    The John and Jane Doe Investors

207.    The John and Jane Doe Investors (the "Investors") are a group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members.

208.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

209.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

E.      **Interstate Commerce**

210.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

211.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

212.    In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advances under the agreements and collect the Daily Payments via interstate electronic ACH debits.

213.    In addition, at the direction of Defendants, the MCA Agreement was executed in Florida, and original copies of the agreement and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New York via Federal Express using labels prepared by Defendants.

F.      **Injury and Causation.**

214.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $1,011,375.15, the amount of the unlawful debt collected by the Enterprise form FTE.

215.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

216.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

217.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

218.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

219.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

220.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

221.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts,

41

including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

222.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

223.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

224.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing, but no less than $1,011,375.15.

225.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

226.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

227.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

a)     Declaring the Plaintiffs' agreements with Defendants to be usurious loans in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)     Against Defendants on account of the First Cause of Action, in an amount to be determined at trial but no event less than $1,011,375.15, plus treble damages and attorneys' fees;

c)     Against and the Defendants on the Second Cause of Action in an amount to be determined at trial but no event less than $1,011,375.15, plus treble damages and attorneys' fees;

d)     Any further relief deemed appropriate by the Court.

Dated:  November 18, 2022

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorney for Plaintiffs*

29825840v.3